Your Honor, the third case in the morning call, 213-1191, Rosemary O'Rourke v. Bruce McIlwain and McIlwain Enterprises. On behalf of the appellant, Mr. Donald J. Morrison. On behalf of the athlete, Mr. Scott Robert K. Scott. Thank you, Mr. Morrison. We're going to proceed. May it please the Court, Mr. Scott. The issues in this appeal is, first of all, I think there's three of them. The first is the negligent hiring cases are the situations where an employer can be held liable for the post-termination acts of an employee. Or the alternative, should there be in Illinois a bright-line rule foreclosing liability in all cases where the actions of the employee are post-termination. Second of all, the issue is the interpretation of this term job site. Whether or not in this particular case, the job site ceased to be a job site the minute that the job was over. Or whether, as we've discussed in the briefs, whether it should be defined geographically rather than temporally. Is there any evidence that there was anything left to do? No. In the O'Rourke's home? No. And there was no tools or instrumentalities? No. Or chattels of Mr. McLean left at his home, correct? No. One-and-a-half-day job completed in one-and-a-half days. And there's no evidence that Mr. Bruguina worked on any other jobs other than this home? Correct. For Mr. McElnay? Correct. The third issue, of course, is whether or not the issue of proxy recall should be decided as a matter of law or whether it should be given to the jury to decide as a question of fact. Do you have any case in Illinois that requires an employer to do a background check for a day laborer like Mr. Bruguina was? No. And I'm not suggesting that that should be a bright-line rule and that if you find that there was a duty in this case. Why was there a duty in this case? There was a duty in this case based upon the particular facts and circumstances of the case, based upon the vulnerability of the victim, based upon the diligent vetting process that she went through, based upon the fact that he knew that this would be a target for potential criminals. And I think that's a question of whether that's reasonable to do, I think is a question for the duty of reasonable care on the circumstances that he knew or should have known at the time that Mr. Bruguina was not fit for the particular purpose of being allowed inside that residence. How? How would he know that? Do a background check. What required him to do a background check? Pardon?  The duty of care. Are you saying any time that the employment involved takes you into someone else's home that you must do a background check? Not in every circumstance. How about every time the employment takes you into someone else's home where there's an elderly widow? I think it would depend upon the facts and circumstances of the case. I think, first of all, the trial court has to make a determination. So it's a factual issue? It's a factual issue. Well, isn't duty usually an issue of question of law, though? I think whether or not the background check needed to be performed is whether or not there was a breach of the duty. In other words, did the duty require you to do a background check? I think that's... Well, that was the question, and you said no, not in every situation. So I'm trying to narrow this down. I mean, if an employer does not have a duty to do a background check in every situation, when does the duty come up? And if you're saying it's specific to different situations, that means each negligent hiring case, the issue of duty would be a question of fact and never a question of law. But, of course, the law tells us that duty is usually a question of law. So it's kind of a conundrum in my mind as to where does this go with this duty to, you know, look at a background. Well, I mean, I think the threshold question of duty is whether or not there had to be any type of background check done at all. And I think that the issue of whether or not a criminal background check needed to be done, and whether he should have, you know, asked him a question, hey, you know, do you have a criminal background. And his answer would have been if it was truthful, what was the criminal background? What was the criminal background? He was convicted in 2008 of felony offense of possession of a stolen motor vehicle. There was a warrant outstanding for his arrest. And more importantly, in 1999, he was convicted of stealing from and injuring an elderly woman. He was served prison for that. But he came up, Mr. McElvain came upon this person, Quino, like a third, fourth party removed. He already had somebody that he hired for jobs, and there wasn't going to be enough. Then he goes to somebody else who says, oh, I know somebody who could help you. He goes to that person, but he needs more than just Mr. Waite, I think his name was. So he brings two other, was it Romero and Mr. Requina along. How far down does he have to go in this process if he's the one trying to make good on his contract? Well, my position is that, and this is why I included portions of my expert testimonies, or my expert witnesses' testimony. My position is that he had somebody that he worked with on a regular basis. And this is a work asked him specifically. In addition to everything else you've done, who is going to be doing work on this job? And he said, well, it's going to be Mr. Edwards. And I've worked with him for two years. I don't have a problem with that. A plaintiff doesn't have a problem with it. A plaintiff's expert doesn't have a problem with it. The next issue becomes, you need extra help, okay. Santiago Waite, at least he's worked with him before. He comes recommended by the other contractor that he worked with. The problem was is when he says, oh, by the way, despite how careful this is about who's going to do this job, bring two people with you without any qualifications. And then what the expert witness would say in this situation, in these situations, it's not uncommon that we need more laborers. But when you need more laborers, there are places out there like Manpower where you pay a little bit more money than you pay. And you get somebody that comes with background checks. Instead, he went on the street without even being able to interview this person. And that's where we think the breach is. And it's not a situation where I think there's a duty every single time. But I do think in this particular factual situation, Mr. McIlvain had a duty to conduct a reasonable background investigation. And he did absolutely nothing. But then we get to the point where his employment was terminated that day. It was a two-day job. And then he never worked with him again, never met with him again. Correct. So how long is he liable for the actions of this man as it relates to that one job? Whenever it was foreseeable that it happened. And that's why I recognize this court's decision in the Doe case. And I recognize that in that case, this court declined to make a definitive ruling on this issue. But the facts of this case are, and the key is that at the time he hired Mr. Requeno, he should have known that the foreseeable act was not that he was going to hurt or steal from Mrs. O'Rourke during that one-and-a-half-day period. Because he was going to be there. His co-workers were going to be there. And if there was anything stolen from the residence during that period of time, those are obvious targets of criminal investigations. What's most foreseeable, what was most reasonably foreseeable for Mr. McIlvain at that time, was sometime after the employment ended that he would come back and break into the house, based upon his prior criminal convictions. That goes back to this issue of a duty to do a background check. And this individual comes to him on the recommendation of somebody who he knows and has worked with in the past for a two-day job. But he wasn't recommended at all. There was no recommendations. All he did was say, factually, all he did was say, This Santiago Wake, he's worked with him on one or two previous occasions. And he says to him, hey, bring a couple of your buddies. And I think that's a breach of the standard of care. That's negligence. That's a breach of the duty. There's no case law that says that that's the case. I haven't had any case law or statutory. Well, not necessarily, because there are certainly cases where. Duty is a question of law. These are the facts, and you're asking us to say that there is a duty. Right. But in certain other cases, the Greger v. Kauser case, the Warren case, the Greger case, that wasn't there. I mean, there are certainly, and I guess I kind of go outside the jurisdiction when I talk about the other cases outside of Illinois, which have found a duty for these post-determination actions. Those were residents' cases. The Abbott case out of Florida, the McGuire case out of Arizona, and the Cove case out of Pennsylvania were all cases where the ultimate holding that was upheld by the health courts in those states was that there was a duty in that circumstance to do a background check on these individuals. And I don't think that that's, even in cases like Strickland, where you have a cable contractor who comes in and comes back at a later date and sexually assaults the homeowner after doing work, the question wasn't whether or not there was a duty to do a background check. The question was the background check revealed only the fact that there was traffic convictions, and therefore there was no proximate cause. And I think it's important to note, regarding this post-determination, these post-determination actions, that counsel brings up this issue of control and whether or not the, because, and that's, I guess, a concern. If the employer has no way to control the employee anymore, why is there liability? And the answer to that is because the liability, it's not a negligent supervision case. It's not a case where we're saying the duty was ongoing. In those cases, it's rational to cut it off at the end of the employment. This is a negligent hiring case. And in a negligent hiring case, the duty arises at the time of the hiring. Well, under 317, if you've got somebody who's still your employee and they go outside the scope of their employment and they commit a criminal offense, you theoretically under 317 still have control, some form of control because they're still your employee. Now they still have to be using, but they have to be using your channel or on a job site. Right. Correct? Correct. But what you're saying is if they're no longer your employee, you don't have to worry anymore about a channel or a job site or anything. So, in fact, when they are your employee, your liability is less than when you terminate them based upon your argument. I still think the job site requirement is there. I just think that when the 317 came out, it's meant to define geographically the place that you're working and the place of the job site versus a car situation where they're off-site versus a print situation where the torque user drives away from the premises versus even an Escobar situation where the court said, no, we're not going to say it's a job site because you're a few blocks away. I still think there's a requirement to job site. Is this case, so what you're saying is since there is a job site requirement, this case is entirely governed under 317? This case is governed under 317. No other section of the restatement of torts? 312, I think. 302B. 302B. 302B is the one that they cite in Abbott and Marquette and McGuire and, I don't know, Coles. I think they may cite it in that, too. Those cases that talk about post-termination, they never address job site. They never address 317. They're strictly 302B cases. But I think that Illinois, in most cases that you read, they take language from 317 and require either a job site or instrumentality. And I think that makes sense. I'm not quarreling with that. What I'm saying is when you look at the facts of this case from a policy standpoint, we're going to determine, this court is going to determine at one way or the other whether or not there's a bright line rule or whether or not there can be exceptions. My point from a policy standpoint is this. If you have an employer at the time of hiring who takes somebody in and whether it's something they knew or should have known, let's say they know, they look at the job and they say, look, I've hired this person for a three-day job. I can't see any particular unfitness of this person for the three-day job. I can't foresee any harm that this person can do during the job. But I can reasonably foresee that after this job is over, whether it's one day later, whether it's two days later, or whether it's two months later, maybe six months later, the key is if that employer can foresee that this person that they're hiring can come back to the place where the job was and injure the person that hired them to do the job, then if this court were to make a bright line distinction, that that employer could go ahead and hire that person. And I submit to the court that that is not going to sound public policy. Does the comment for 317 say sometimes the only action, the best action an employer can take is to terminate the employment? And then here, again, the employer didn't know about this background, but in effect terminated the employment. And had he found out about his background, terminated his employment, and notified Mrs. O'Rourke? Is this a notice case? No. What about Abrams out of Ohio? Abrams out of Ohio, you know, Ohio has a... That case seems to be on all fours with this case, factually. I would take the position that it's Abbott. But in Abrams, where I point out in my brief is, in Abrams, there was one of the elements. If I can just continue with my thought. Sure, absolutely. One of the elements was that there has to be an employee-employee relationship at the time of the injury. And that's the law in Ohio. And so they simply said the employment's over. There's no more employee-employee relationship without any good sound reasoning as to why that is the law. I do have a very fundamental question, and I'm not sure it's cleared up. Mr. Aquino and Mr. Romero came with Mr. Waite. Who was the employee? Were they employees of Mr. Waite or were they employees of Mr. McElveen? Because I'm not sure that's clear from this particular record. I think that the defense has conceded that it's either that Mr. Waite – I'm sorry, Mr. Aquino – was either an employee or an independent contractor of Mr. McElveen. And whether that – and that's a distinction without a difference because, as we know, there's no difference in negligent hiring. McElveen paid him, didn't pay his money to pay him. McElveen actually paid Aquino directly. So anything we would do here under these set of facts would not in any way impact a subcontractor who's hired by someone and brings in a crew. It wouldn't – we're not going that far. No, I'm talking about the person who's responsible for making the hiring decisions. And in this case, factually, there was no other – I guess the only decision then was Mr. Waite, who decided which two of his buddies to pick up off the street and bring in. Let's say we decide that there is potential post-termination liability here. I mean, how do you get over the proximate cause hump with some of these cases that are out there, Illinois cases that are out there, that appear to go against it? Well, I think the case that's most similar is the Elliott v. Williams case, and I cite that as being most similar. And I won't go over the facts. I know I'm out of time. But Carter, the case that's – if you look at cases like Carter, Strickland, and Doe, I mean, Carter was a condition versus cause case. But in that case, all the employer did was introduce the security guard and the victim. And that's not enough to be a foreseeable – that's not enough to be a legal cause. It was cause in fact, but not a legal cause. In this case, legal cause comes down to foreseeability, and that should be an issue for the jury to decide. Look, had you – if the jury finds that he should have known whether or not he had this criminal background, was it reasonably foreseeable that he would have come back and done this? And it's not just introducing Mr. Requena and Rosemary O'Rourke. If Mr. Requena had seen Rosemary O'Rourke two months later in a park somewhere and decided to assault her, there would be no liability. I mean, you know what? I want to bring you back to this, this whole thing about the background check, and I know you're out of time. It goes – your argument is that under these circumstances, an employer must do a background check. That's your argument. I believe – I believe in this case, if this case were to proceed – Under these circumstances, he must do a background check. And that's the only way – But you're arguing here for us to find that there is a duty. Well, that's true. But then we went on to trial. I'm not looking for a jury instruction that says, as a matter of law, ladies and gentlemen, there was a duty to do a background check. There was a duty of reasonable care at the time of the hiring, and it's for the jury to decide whether – based upon not only evidence but upon expert testimony of people. And the expert testimony – it's not like a car accident case, and it's not a medical malpractice case, but it's somewhere in the middle. And when they hear from an expert witness that says, boy, in these situations, you don't just hire someone off the street and put them in that house. They're – Mrs. O'Rourke is a target, and there is criminal element out there. And so there are things that you do and you don't do. And they're free to hire an expert who says, oh, no, no, no, there's no – there's no duty. You don't have to do a background check. That would be overly intrusive. And so I guess that's my best answer to that. I'm not saying in every single case, and I'm also not saying in this case, as a matter of law, there's a duty to do a background check because there's no statute that says that and there's no case that says that. But I think that's a jury – that's a question for the jury to decide along with proximate – along with proximate cause. Thank you. Thank you. Mr. Scott, you may proceed. May it please the Court, Mr. Morrison, my name is Robert Scott. I represent the defendant appellee in this case. Justice Burkett, you mentioned Aberds v. Worthington. It is the Ohio case. We think it is the most factually similar. It also was a two-month period of time and involved a furniture mover. He came back and committed a crime. And that court very clearly said, even though it might be foreseeable, even though it might be foreseeable, there's no liability in that circumstance. Justice Hutchinson, on the issue of subcontractor versus employee, I tend to agree with Mr. Morrison that in this case it probably doesn't make a difference. We're not making that argument. But just so the record's clear, Waite, who is the person that Mr. McElvain went to first, he had known Waite for 10 years. Waite had worked for an architect that McElvain did work for. He did ask Waite to find two other people. Waite then brought them to the job and recommended them because he brought them. You know, we'd say legally they probably are subcontractors or independent contractors, but they still have a case even if he's an independent contractor. Well, if we stop short of a background check, because Mr. Morrison did suggest that ask some questions. All right, Mr. Waite brings these folks along. He's known him for 10 years. Well, don't we assume that since we've known him for 10 years, or your client might have said, well, I've known Waite for 10 years, he must be bringing me guys who are decent guys. Absolutely, yes. I mean, well, first of all, he must be bringing guys who can do work, the work. Does it go beyond just the work? I mean, yeah. Mr. McElvain trusted Mr. Waite to bring him people who would do the work. Now, how much further it went than that, there really isn't a record. The facts are that McElvain asked Rickania for identification. He had a state of Illinois ID card. McElvain took the card, wrote down the information, including the number. And then the other factual thing, just to tell you, because you raised it, I don't know how important it is, when McElvain paid them for the day and a half, so we're talking 12 hours' work over two days, a day and a half, because of some check situation, he wrote the check to Rickania, the criminal, and Rickania then paid the other two fellas. So that's factually how that went. Did McElvain owe a duty of reasonable care to the plaintiff in bringing employees into the home? Well, we would say in this case that there's no legal duty under the facts of this case, because of the incident occurring two months later. I'm not talking about that. I'm talking about his argument is there's a duty of reasonable care. And what happened, and whether there should have been a background check and all that, goes to breach, not the duty. And whether there was a breach or not is a question of fact in this case. That's his argument. I'm not going to put words in his mouth. So my question to you is very simple. When you're going to bring people into someone else's home, you're an employer, you're going to do work in someone's home, do you owe them a duty of reasonable care of who you're bringing into their home? Not under Illinois law. There's no statute that requires it. And there is a statute now that for certain types of employers does require health care workers, et cetera. I have a list of them in my file. I can't remember them all, Justice Burke. There is no statute that required it in this case. There is no Illinois case that requires it. So I would say under the law, there is none. Now, let me say this also, Justice Burke. In those cases in the other jurisdictions, and I made a list of them, I'm not going to bore you with all of them if you don't want it or need it, but where a court ends up saying that a duty is imposed, there are different facts. So if you look to Florida in the Abrams case, where the court ends up finding liability of the employer for negligent hiring, the Florida court uses this phrase free and independent access to the home. There's two situations in these cases. One is an electrician, I think, or a construction worker who had a key to the home that he kept and then went back a few days later and committed the criminal act. There's another Florida case, and it's Williams v. Feather. The interesting thing there, Justices, is that when the guy who committed the crime was a maintenance worker at the time of the crime. It was townhomes. He had a key, a pass key, to every townhome. Again, that's free and independent access. He uses the key to get in later and commit the crime. When he's a landscaper, because he started as a landscaper and not as an inside maintenance worker, the court says there was no duty. That is why in our briefs we took a little bit of time to point out that this gentleman, Requena, in our case, really is way more akin to a landscaper, even though he got into the house. It wasn't free and independent access like Florida courts talk about. He didn't have a key. He didn't have anything like that. In fact, in those cases, does it matter whether it's post-termination or during the employment? You know what? It doesn't seem to. In all these cases, I listed whether they were post-termination or still employed. I do believe that Abrams is just a few days after. I'm sorry. Not Abrams. Abrams was the... Abbott v. I'm sorry. It's Abbott. It's Abbott. Abbott v. Payne is post-termination. So is McGuire. So is Cove. Yeah. So, I mean, are you asking us to say that there can never be a negligent hiring cause of action post-termination? I knew you'd ask that question. And so, you know, I don't want to be somebody who comes up and just says yes because that's what would be best for my position. So I'm going to answer it this way. Yeah, if you said that, summary judgment would be affirmed and that would be good for my client. But I have to say it's up to you. For the reason that, you know, even if there isn't a bright line rule, under the established law that we have in Illinois, we're entitled to this judgment. I mean, because it's not a job site any longer. He's not using the chattel, a chattel or an instrumentality of the employer. Under Carter and the concept of proximate cause, legal cause, as Mr. Morrison was talking about, under Carter, this case never makes it through. Because essentially this is a lot like Carter in that the factual situation allowed Mrs. O'Rourke to come into contact with Requena, but that's all it did. He just was going up and down to remove the insulation. Yes, sir. He did not have pre-reign or access, was not given a key. Did not. And while counsel, and I understand why I say it respectfully, argues about the very intimate details of this and that, she's a widow, she's elderly, she lives in a big house. The truth is there's no evidence that he knew she was a widow. Her husband could have got away. No evidence other than the house and the furnishings that perhaps she's wealthy. And when he comes back, he breaks in. What happens that day, Justices, is he comes there in the morning, according to the evidence, knocks on the door, calls out, I'm a furnace repairman. Mrs. O'Rourke's on the second floor. She looks down. She does not recognize him. He had only been there a day and a half, and it was two months ago. She calls the police, and he leaves. So anything else you'd like me to focus on? Well, I know this would not be your focus particularly, but if we were to create a rule, I mean, Mr. Morrison kept saying under these circumstances, in these circumstances. If we create an opinion, if we go to that level, we have to do something that will help the litigants out there, the employers out there. How could we craft such a under-these-circumstances rule? I don't know. What I would do is look to the law that exists in this state and perhaps in other jurisdictions. My position would be that the job site and the chattel are still an important thing. I know that's looking further down the road after an incident occurs, but you're honest. I do not see how we could create a rule, especially in a factual situation like this where, Justice Burkett, this is a day laborer's sort of situation. This is really sort of similar to going, you know, how they still do and used to do. You'd go to a Menards or some other place and pick up day laborers, and then they would do work. Honestly, I don't have a real answer for that. And so if there's not going to be a bright-line rule, you know, maybe we are stuck with looking to the current law and the facts of each case. I mean, what if he had given Mr. Aguina a key and forgot to collect it after the job was done? I don't think that would be good. That might. Yeah. I think that would not be good, and especially, Justice Burkett, if you're looking to some of the other things that these other courts have looked at. Well, would the key then be considered a key? Exactly. I was thinking about that last night. I would say that's the chattel or the instrumentality. And that's why I thought you'd talk about maybe in the Florida cases that phrase free and independent access. That's the answer that I came up with. The chattel is the key. Some cases, there was another case that went even a little bit further. It's the Arizona case. I forget the name. That is the burglar alarm. Thank you. Burglar alarm guy. Because he put in the system, he knows how to disable it. No. But maybe this is a little bit further answer to your question, Justice Burkett. Maybe that's where the legislature has to come in. And haven't they in some sense? I honestly don't know the answer if burglar alarm persons here fall within the term security guards. I would guess not. But in Illinois, we now have a statute that says if you're going to work for a private security company, they have to do a background check. So we have that statute. And, you know, perhaps if you're doing burglar alarm work, that might be one to put in the statute, too, because that person then doesn't even need a key. The post-termination cases don't talk about 317 at all. I've mentioned that to counsel. They talk about 302B, and that's introducing someone that you know has these violent tendencies and things like that. And they seem to be grounded in that and not 317. Do you have a comment on that? Well, you know what, I frankly have to say I didn't notice that in reviewing the opinions. Now, I had somebody help me review the opinions, and I have a blurb on each one. But I didn't notice that they made a distinction. Are we talking in particular about Florida? Yeah, Florida does. A number of them talk about 302B. Yeah, and this case really has been litigated on 317 only. That's why I asked counsel. McGuire specifically referenced 302B in the restatement. Kolf, 302B. Marquette, 302B. None of them mention 317 at all. Yeah, Kolf, I don't have a specific answer just for you. I'm sorry. Perhaps 317. I mean, when you read 317, it seems to be phrased, or at least it's arguably phrased, in that the person is acting outside the scope of the employment while still employed. Okay. And then the comments talk about sometimes the only thing you can do is terminate them, meaning they're still employed, and then if you find out something bad about them, you terminate them. Well, and then we sort of get to that conundrum or whatever. What if that happens? You terminate them, which you should, because you don't want that person committing a crime while he's employed by you. And then afterwards, there's really nothing you can do, especially in a situation like this. The duty would be a duty to notify. Yeah. If there's a duty to do a background check for day laborers in this situation, then Mr. McIlvain would not have been able to complete the contract on time because it's going to take days, perhaps weeks, to get a criminal background check back, unless you break the law and have a friend who's a cop or a police officer do the check. That's absolutely true. And then here's the other thing that we learned, and we discussed some of this with counsel's expert, Mr. Marshall, but Justice Brickett, how big is the background check? Is it national? Is it just statewide? Does it reveal that he's an illegal alien? Does it not? What does it actually end up revealing? It doesn't satisfy this duty if you get the person from a place that you're relying on them to do the background check, or you're at least relying on it's a friend. Somebody says, this is my friend, and you make some inquiry. You do something other than just say, bring anybody you want. That's a tough question. I mean, how much do you really? I mean, I have to get to the specifics. Let me follow, which is what they talk about. Here's the strange thing about Mr. Marshall, who was their expert. Now, we had a motion to bar. It was mooted because of the summary judgment, so it was never ruled on. But Marshall knew nothing about background checks or anything like that. All he knew was that his partner had brothers who were police officers in Chicago. Once in a while, 1% of the time that they actually hired somebody, Marshall's company, they would say, take a look at this guy. They never got an answer about a criminal background or anything like that. The only answer they got was, you can hire this guy or don't go near this guy. Which is a, they're committing a crime when a police officer does that. That's criminal. Right. And not really getting an answer other than a vague opinion saying, don't hire this guy or go ahead and hire this guy. But, you know, in a situation like this, the day laborers, you know, you're kind of asking about that. Just don't see how. I just don't see how the law could be that you have to do that and then it wouldn't work anyway. You'd have to do it weeks before. And what information you'd come up with, you wouldn't know. Based upon the committee comments that suggest if you find out you have a problem with an employee, your best bet is to terminate, it doesn't say that you then have to go back to everybody you've worked with, does it? No, it doesn't. Right. And, I mean, how, what would, if the person's terminated because he drove your truck into another car, do you have to, you know, how would it then say, okay, we've terminated that person, so we've got to go back and tell everybody that he's a bad driver? I can't imagine that it could ever say that because it's just not practical, Justice Hutchinson. Thank you very much for listening. I appreciate it. Mr. Scott. Mr. Morrison, rebuttal argument? Mr. Morrison, I'm going to ask you to think about this as you're working up. I'm going to ask you the same question I asked Mr. Scott. If we were to craft something, how would we do it? In this, in a circumstance where we have a widow who lives in a big house and it looks pretty comfortable, we have to do X, Y, Z? I mean, what is, what do we need to do? Do you mean to protect the contractors? To protect anybody, to protect your client or people like your client, to protect the contractors. When we issue opinions, we're supposed to be giving some direction. We're technically not supposed to do policy. That's the Supreme Court's job, but we often do. But we're supposed to be doing instruction. How can we instruct the litigants and lawyers who do work like you and Mr. Scott? Well, the answer to that is that not creating a bright line rule would protect people like Mrs. O'Rourke in situations where it was reasonably foreseeable that she would be heard post-termination. And the protection that's out there for the defense or for the contractors is this issue of foreseeability and the stringent proximate cause analysis that this court and other Alamo courts do. Because what protects the contractor and the defendants is that even if there is a duty, and even if a tribe finds that there's a breach of the duty, if that injury was not foreseeable to the contractor, then there's no proximate cause and there's no liability. Well, maybe you're saying don't create a bright line rule, but by the same token, if a contractor thinks someone's vulnerable, then he or she, the contractor, has to do something. Now we have to define vulnerability. Just because the person is a widow who is relatively comfortable doesn't mean she's vulnerable. It just means that she had a misfortune in her life, but she's wealthy, and maybe she has a burglar alarm. I mean, who determines vulnerability?  I think that the threshold duty question, if we're following 317, is was there a reason to know of the danger? Was there a particular fitness that was known or should have been known at the time of the hiring? If so, then there's a duty of reasonable care. I'm buying into this. I'm not buying in, but for the sake of argument, that a background check, you think a background check should be required in these circumstances? Yes. How long does a background check take? Your expert witness testified essentially that a phone call to a police officer and that police officer does the check and gives an answer. That's not why my expert witness was retained. That was questioned by the defense. That was his testimony. That's the quickest way, but it's also a violation of the law. That's official misconduct if a police officer does that. How long does it take to do a background check? Nowadays? Do you know? Where did you live? I lived six months ago. I moved here from Orange County, California. You can either call on the phone or get online and get conviction information. I'm not talking about what this guy was talking about was arrest information and all that stuff. That's civil rights violations. That's official misconduct. Absolutely. My expert was retained to say that in this situation, in answer to your question, how do you get the job done? Instead of paying $15 an hour for someone off the street that you've never met before, you go to Manpower and you pay $35 an hour. And you do it the right way. And you do it the safe way. And then you can get the job done. But he underbid the job. That's not my client's fault. My client shouldn't be put at risk and her safety at risk because the contractor underbid the job. My expert is not an expert on how to do these criminal background checks. He had people in his office doing it. He was virtually clueless about that. That wasn't in my 213 message. That's not why I disclosed them. Those were questions by counsel. He was disclosed to say in these types of situations, you have a couple different choices. You hire somebody that you know, that you've worked with before, that you know a little bit about his background and you can trust. Or you go to Manpower. And Manpower has already done that background check? Absolutely. That's why it costs $35 versus $15. And just to answer his question about a pass key or a key, I think that, again, we're talking about fact-specific cases. And in this case, whether or not Mr. Requeno had a key wasn't going to make a difference. When you have the criminal background that he did, the violent criminal background that he did, the theft convictions, the warrant out for your arrest, he was going to that house and he was going to break into it. And if she wasn't there, what he did earlier that day is he knocked on the door hoping that she wasn't there. And when he was there, he said, oh, I'm going to come back at night. And he came back at night, and the reason she's a target is because whether she's there or not, he's getting in that house and he's going to steal something. Pass key or no pass key, under the facts of this case, he was convicted of the exact same thing that he did. What could be more foreseeable? So now we're evaluating not the vulnerability of the party who lives there but the vulnerability of the structure. Is it something a criminal would like? Now we're making it an even bigger task. Well, you have to draw reasonable inferences from the facts. And the facts are, in this case, he didn't have unbridled access to the house. He was there for 12 hours. He had contact with Mrs. O'Rourke. He walked up and down various rooms. He went into the basement. And for whatever, he didn't just pick that house out of thin air. The reasonable presumption, which a jury can do, if you look at the – what a reasonable jury – could a reasonable jury – could a reasonable jury draw an inference that, based upon his contacts with Mrs. O'Rourke and that residence, that he chose that residence to go back and burglarize and commit a home invasion? And the answer to that question is a resounding yes. And if a reasonable jury could draw those inferences based on the facts, then the issue of proxy cause is for the jury to decide. Thank you. All right. We'd like to thank the attorneys for their arguments in this very interesting case. And we will take the case under advisement.